FILED
05/29/2026
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 18, 2025 Session

**IN RE TROY R., ET AL.**

**Appeal from the Juvenile Court for Shelby County**
**No. Z2683    W. Ray Glasgow, Special Judge**
_____

**No. W2024-01738-COA-R3-JV**
_____

This appeal involves a long-running custody dispute between unmarried parents. In this latest chapter of the litigation, the father filed a petition to modify, seeking to be named primary residential parent and/or increase his parenting time. The mother filed a counter-petition, seeking only a change in decision-making authority. The trial court denied the father's petition but did make several changes to the parenting schedule. The trial court also granted the mother's request to be named sole decision-maker for educational and extracurricular decisions and allowed her to obtain passports for the children. Finally, the trial court ordered the father to pay the mother's attorney fees. The father appeals. We vacate in part, affirm as modified, and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Vacated in Part, Affirmed as Modified, and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and VALERIE L. SMITH, J., joined.

Darrell D. Blanton, Memphis, Tennessee, for the appellant, Hermes Rosa.

Laurie W. Hall, Memphis, Tennessee, for the appellee, Jianping Huang.

**OPINION**

## I.   FACTS & PROCEDURAL HISTORY

Hermes Rosa ("Father") and Jianping Huang ("Mother") were never married but have two children as a result of an extramarital affair. When the affair began, Father was married and worked at a university. Mother, who is Chinese, was in the United States on

a student visa and worked as his graduate assistant.

At the outset, we note that the parties have been involved in three different periods of litigation -- in 2013, 2017-2018, and 2023 to the present. The parties' oldest child, Troy, was born in 2012. Father filed a petition for custody in 2013, and Mother filed a counter-petition for custody. Both parents resided in Memphis at the time. Father alleged that Mother had threatened to take the child to China, while Mother alleged that Father had threatened to take the child and have her deported. After a hearing, the juvenile court found that both petitions should be sustained. It awarded "joint custody" to both parents but named Mother as the primary residential custodian. Father was to have parenting time with Troy on the first, third, and fifth weekends of the month, in addition to certain holidays and in the summer.

The parties had a second child together, Alivia, in 2017, and Father signed a voluntary acknowledgment of paternity. One month later, Father filed a petition seeking to oppose a proposed relocation by Mother, set a parenting schedule for Alivia, and modify the existing parenting schedule for Troy. According to the petition, Mother planned to relocate with both children from Memphis to Jacksonville, Alabama. Father alleged that it was not in the best interest of the children to relocate so far from Memphis, where they had an extended support system including half-siblings, other family members, medical care, and Troy's school. Father again expressed his concern that Mother would flee to China with the children. He sought to be named primary residential parent of both children in the event that Mother relocated. Finally, Father sought an award of attorney fees. Mother filed a response. She admitted that the parties needed a schedule for Alivia but asked the court to limit Father's parenting time due to the fact that Mother was still breastfeeding the infant. She asked the court to enter a modified schedule for Troy based on her relocation to Alabama. She denied that she planned to relocate to China. Finally, Mother sought an award of attorney fees as well. She also filed a separate motion to require Father to cooperate in obtaining passports for the children so that she could take the children to visit her family in China.

In August 2017, a juvenile court magistrate entered an order resolving the petitions. At that time, Troy was five years old and Alivia was three months old. The order stated that both parents were educated professionals who had engaged in an "on and off relationship over several years." It stated, "At times they have all lived together and at times they have lived separately but throughout the children's lives both parents have stepped forward to provide for the children and, especially as to Troy, both children are closely bonded with each parent." The order noted that Mother had completed her education and accepted a position as an assistant professor at a university in Jacksonville, Alabama, a distance of roughly 300 miles from Memphis. The magistrate found that a material change in circumstances had occurred as to Troy, warranting modification of the prior order. He found that most of the best interest factors favored both parents equally, although a few favored Mother with respect to Alivia due to her very young age and the

- 2 -

fact that she was nursing. However, the magistrate found that Father appeared more likely to facilitate and encourage the parent-child relationship with Mother. Ultimately, the magistrate found that it was in the best interest of the children "to spend as much time as possible with both parents" and awarded joint custody to both parents, with Father being primary residential parent of Troy in odd years beginning immediately, and Mother being primary residential parent of Troy in even years. The magistrate designated Mother primary residential parent of Alivia for a specified period due to her breastfeeding the child, and then Alivia would assume the same rotational schedule as Troy. The alternate residential parent would have parenting time on the first, third, and fifth weekends of each month, in addition to time on certain holidays and summer break. On the passport issue, the court found that Mother had clear reasons for wanting to travel to China, but at the same time, Father had logical concerns about such a trip. The order stated that "as the U.S. Department of State has clear guidelines for obtaining a passport, the Court did not find it appropriate to insert itself into this dispute." Each party was responsible for his or her own attorney fees.

Mother filed a petition for rehearing of the magistrate's decision in August, claiming that he failed to apply the parental relocation statute, but the rehearing did not take place for several months due to numerous continuances. During that time, Troy primarily resided with Father, and Alivia primarily resided with Mother in Alabama. The matter was finally reheard by a special judge in February 2018, and an order was entered in May 2018. The special judge noted the "different procedural posture" that existed for the children, as there was a prior order in place for Troy, but no existing order for Alivia. As such, it analyzed the parental relocation statute with respect to Troy and the best interest factors applicable to initial custody determinations for Alivia.[1] The special judge found that, pursuant to the version of the parental relocation statute in effect at that time, the parties did not spend substantially equal time with the children, so Father had the burden of proving one of the enumerated grounds in the statute in order to oppose relocation. The special judge found that Mother did have a reasonable purpose for relocation, as she had applied at approximately two hundred universities and received one job offer at Jacksonville State University in Alabama. The special judge found no threat of serious or specific harm and no proof that Mother was relocating to defeat Father's visitation rights. Thus, it found that

---

[1] *See Ramsey v. Ramsey*, No. E2022-01295-COA-R3-CV, 2024 WL 470421, at *6 (Tenn. Ct. App. Feb. 7, 2024) ("The parental relocation statute, Tennessee Code Annotated section 36-6-108, is not applicable in this appeal, as the matter before us involves an initial co-parenting determination. . . . The proper manner to address a relocation request such as the one in this case is for the trial court to consider the best interest of the child.") (citation omitted); *Dayhoff v. Cathey*, No. W2016-00377-COA-R3-JV, 2016 WL 4487813, at *5 (Tenn. Ct. App. Aug. 25, 2016) ("This Court has repeatedly held that the parental relocation statute is inapplicable when the trial court is making an initial custody decision or parenting arrangement for the child even if a parent is relocating."); *In re Lukas S.-M.*, No. M2015-01367-COA-R3-JV, 2016 WL 3662202, at *3 (Tenn. Ct. App. June 30, 2016) ("[T]his court has held that the standards in the Relocation Statute should not be applied when the court is making the initial custody decision or parenting arrangement. . . . Rather, in an initial custody decision, the trial court must 'consider what is in the child's best interests' as provided in Tennessee Code Annotated section 36-6-106.") (citations omitted).

Mother should be permitted to relocate. The court evaluated the best interest factors for Alivia and found it was in her best interest to remain with Troy and for Mother to be named primary residential parent. Thus, Mother was permitted to relocate with both children, and Father was to have parenting time on the first, third, and fifth weekends of the month, from 6:00 p.m. Friday until 6:00 p.m. Sunday, in addition to certain holidays and summer visitation. The order stated that Father was responsible for traveling to Alabama to pick up the children for parenting time, and Mother was responsible for picking up the children at the end of his parenting time. Like the prior order, this order stated, "The Court finds that the U.S. Department of State has clear guidelines for obtaining a passport, and the Court hereby declines to insert itself into this dispute." Notably, the 2018 order concluded by stating that the court "hereby reserves the issue of attorney fees." That issue was apparently never resolved.

The third period of litigation began in 2023, when Father filed a petition to modify custody and the parenting schedule. By then, the children were ages eleven and six. Father's petition noted that the 2018 order permitting Mother to relocate to Alabama provided him with 80 days of parenting time, which was primarily on the first, third, and fifth weekends of each month. He alleged that a material change in circumstances had occurred and that it was in the best interest of both children for him to be designated primary residential parent, or in the alternative, for his parenting time to be increased. Father noted that Alivia was an infant at the time of the prior order and that both children were now in elementary school. He alleged that he was capable of retiring and having more time to spend with the children, and the children were now capable of spending expanded time with him and their half-siblings and extended family in Memphis. Father alleged that Mother had a live-in boyfriend and was restricting Father's telephone contact with the children. He also alleged that the exchange times of the current schedule were not always workable due to the distance between the parties. Finally, Father sought an award of attorney fees.

Mother filed a response. She denied that any material change in circumstance had occurred that would warrant an *increase* in Father's parenting time. Mother alleged that she had lived with her boyfriend since 2020. However, in the event the court found that the 300-mile drive was "getting more challenging and riskier for Father" due to his age, Mother stated that she was "open to" replacing his weekend parenting time with *equivalent* parenting time over the summer and school breaks. She admitted that the parties had sometimes changed the exchange time for the children and noted that Father sometimes exercised his parenting time at a property he owned in Mississippi. She denied restricting Father's access to the children but admitted that communication had become more difficult as "their schedules have become full, both with school and extracurricular activities, such as band, cheerleading, piano, ballet, soccer, violin, and martial art." Mother alleged that Father was uncooperative with the parenting schedule and "emotionally abused her multiple times." She expressed concern that his "unwillingness to be flexible with the parenting schedule may lead to [the] children being unable to participate in certain extra-

curricular activities." Mother also alleged that Father had an unrealistic fear of her fleeing to China and still refused to allow the children to obtain a passport. She asked the court to deny Father's petition and award her attorney fees for defending against it. She then filed a separate motion for an order permitting her to obtain passports for the children. Father opposed the motion, arguing that the matter had already been resolved by the 2018 order and that Mother did not allege a material change in circumstances that would warrant modification of that ruling.

Mother then filed a counter-petition to modify the 2018 order, but she clarified that she sought a change "as it relates to decision-making only." Mother alleged that Father's opposition to the children traveling had caused them to miss an opportunity to travel to Europe with her on a University-sanctioned trip. In addition, Mother alleged that Alivia was prediabetic and that she could better manage her medical condition. She alleged that Father's refusal to "swap" days of parenting time had resulted in the children missing extracurricular activities they desired to attend. Thus, Mother asked to be named sole decisionmaker for the children. However, Mother insisted that "the residential parenting schedule and designation of Primary Residential Parent should remain the same." She did suggest, however, that if Father was retiring, he should be responsible for traveling to Alabama to pick up the children and also returning them at the end of his parenting time, or he should be required to exercise his parenting time in Alabama. She again clarified that "the only modification to the parenting plan should be with regard to major decision-making authority and transition."

The matter was heard by the juvenile court over the course of two days in July and September 2024. At the time of trial, Father was 71 years old and Mother was 43. Two of the major issues the parties faced related to the distance between their homes and the number of extracurricular activities in which the children were enrolled. Father wanted the children to relocate to Memphis and live primarily with him, while Mother's counsel insisted that "the only change in circumstance has to do with the decision making, not the parenting time." When asked if she had submitted a proposed parenting plan, Mother's counsel responded, "No, Your Honor, because all we want is a change in the decision making. So we don't concede any other changes."

Father testified that he was an Air Force veteran and remained employed at the university, but he was eligible for retirement and could do so after a thirty-day notice. He had three children in their forties and several grandchildren. Father and his wife reconciled after his affair with Mother, and he remained married. Father was a runner and testified that he had no health issues that would impact his ability to care for the children. He testified that although he resided in Memphis, he also owned a lake home in Iuka, Mississippi, and he sometimes exercised his parenting time there due to the long distance between Memphis and Jacksonville. He explained that doing so shortened his drive by about 100 miles and two hours of driving time. As previously noted, the 2018 order required Father to pick up the children in Alabama on Fridays at 6:00 p.m. for his parenting

time, and Mother was required to pick up the children from Father on Sundays. The drive took at least five hours each way, such that one parent was required to drive ten hours round-trip at each exchange. Father testified that he had arranged his work hours so that he could be off work on the Fridays when he picked up the children in Alabama. He and Mother had also changed the pick-up time for Friday exchanges from 6:00 p.m. to immediately after school, between 3:30 and 4:00. Father testified that he and Mother had agreed to meet halfway a handful of times, in Tuscumbia, Alabama, and he believed that it would be "easier on everybody" to change the transportation arrangement to require meeting there every time. He opposed Mother's suggestion that he should be required to make both the pick-up and the return drives in one weekend or visit in Alabama in the event he retired. Father explained that doing so would effectively reduce his parenting time with the children and cut out any time they would have to spend with his family in Memphis.[2] He noted that Mother had no family members in the United States.

Father said he believed that the children should be able to participate in extracurricular activities, but "family should come first." Alivia, who was in second grade, was already enrolled in cheerleading, taekwondo, violin lessons, swimming lessons, and art activities. Troy, who was in seventh grade, was in band, taekwondo, piano lessons, and

---

[2] On cross-examination of Father, Mother's counsel attempted to clarify that Mother was not seeking to *reduce* Father's parenting time, questioning him as follows:

Q. You testified that [Mother] wants to reduce your parenting time, but, in fact, she's not filed any petition to reduce your parenting time; she's only -- the only petition before this Court has do with decision making?

A. Actually, if you take into account what she said about me picking up and dropping off the kids, that reduces my parenting time.

Q. Well -

A. And if you take into account the, if I had to do all my parenting time in Alabama, then my family would not be able to participate in the visitation.

Q. Okay. Well, she hasn't asked the Court for your parenting time to take place in Alabama. She's not asked the Court to modify the parenting time at all.

A. I believe I saw a motion where she said that she wanted me to pick up and drop off the kids, and she wanted me to do the parenting - if -- if the Court did not agree to that, then she wanted me to do my parenting time in Alabama.

Q. Okay. Well –

A. And that's what I was referring to.

Q. Understanding that she's only asked the Court to change -- for the- passport issue and to address the legal custody do you understand that she's not trying to reduce your parenting time?

A. Actually, it reduces my parenting time. If I have to drive -- if -- it may not be in the parenting time, but if I have to drive and pick up the kids in Alabama, that reduces my parenting time, because I would be driving the kids back, and I would be driving the kids when I pick up. And that time of driving I'm, even though the kids are sitting in the car, I'm not really interacting with the children. So that reduces my parenting time.

Q. Okay. I'm going to move on.

- 6 -

trombone lessons. Father said he had attended a few events and driven back home in the same day, but it was difficult because of all the time he was already spending driving back and forth and the time he was taking off work.

Mother testified as well. She married her boyfriend in between the two trial dates. She had also obtained a green card as a permanent resident. She intended to apply for citizenship when she became eligible and said she would have to give up her Chinese citizenship in order to do so. Mother insisted that she had no desire to move back to China but did want to take the children there to visit in order to meet her family.

Mother testified that the travel between Jacksonville and Memphis two to three weekends per month had become extremely burdensome. She estimated that it took her ten to twelve hours to drive back and forth. Mother said this was rough on the parents and the kids. Mother said she wore thick glasses and that it was difficult for her to see while driving at night, so her husband normally drove them. When asked if she was suggesting that Father should have "to do all the driving," she acknowledged that Father did not want to drive back and forth either. Mother also expressed concerns about the hazards of long-term driving, considering the chances of accidents, flat tires, or bad weather. She said the weekend visits also interfered with the children's extracurricular activities. Mother testified that the parenting schedule should be changed to reduce Father's weekend visitation but provide him with "a longer period" during the summer and school breaks. She explained that this would also allow Father to have longer time with the children rather than driving ten hours on Friday, seeing the children for basically one day, and having them leave on Sunday. Mother believed this would also benefit the children, as they sometimes have homework due on Mondays, and Alivia had difficulty making the long drive due to her prediabetes and frequent urinary tract infections. When asked if she would also like to meet halfway for the exchanges, Mother replied, "I would like to, but there are conflicts." She said "one conflict" was that Father sometimes exercised his parenting time in Mississippi. She also said the 2018 order did not specify where she was to pick up the children, so "there's a lot of conflict." Mother suggested that Father could also exercise his time in Jacksonville, which would enable the children to still participate in their extracurricular activities.

The special judge also heard testimony from Father's adult daughter, Mother's new husband, and another professor who worked with Mother and was also Chinese. At the conclusion of the testimony, the judge announced his oral ruling as to some issues. He first stated that he was going to allow Mother to get passports for the children and travel to China with them. Next, the judge found that a material change in circumstance had occurred, mainly because the children had gotten older and wanted to "do things and learn more things and get involved in more things, and we have to accommodate that." He then announced,

And I'm going to change this parenting schedule, and you're going to

lose some time, [Father], because it has to be that way. She's down there, and you're up here. If you want to move down there closer, you can. Or if you want to drive down there some weekends, you can. But right now, the children are in a great spot, and they need to continue to be in a great spot.

And I'm not going to subject them to having to go back and forth on every other weekend or first, third, and fifth, whatever it is, and give up a lot of things that kids need to do as much as they want to do. But these kids need to have activities, and you need to be big enough to let them do it and not feel that you're being taken away from. . . .

. . .

So I'm going to change this schedule, and I'm going to give you as many days as I possibly can. But I'm going to do this in a way that is going to benefit the children. I'm not doing it for her sake. I'm not doing it for your sake. I'm doing it for your children's sake.

The judge stated that he intended to "review the file a little more" and would enter a written order as soon as possible.

In October 2024, the juvenile court entered its written order, denying Father's petition for modification and granting Mother's counter-petition and motion to obtain passports. The order stated that the court found Father's testimony "evasive, conclusory and at times contradictory." The court found that Father believed Mother was trying to undermine his position as a parent and interfere with his relationship with the children, and that he attempted to portray Mother as deceitful, incompetent, and uncooperative. However, the court found that Father "presented no legitimate reasons that he should be designated primary residential parent." In contrast, the court deemed Mother's testimony "candid, reasonable, and sincere." It found that she remained committed to promoting Father's relationship with the children despite his disrespect toward her. The court found that Mother placed the needs and happiness of the children above her own and was "capable and deserving" of being named sole decisionmaker for educational decisions and extracurricular activities. The trial court noted Father's allegation that Mother was trying to push him away by allowing the children to engage in extracurricular activities without his permission and that he believed the activities were infringing on his parenting time. It found that both parents presented testimony about the lack of communication between them regarding the children's activities. The court noted that Father accused Mother of failing to provide him with information, while Mother accused Father of failing to attend events and refusing to cooperate by exchanging weekends or "otherwise accommodating the children" if they wanted to participate in activities that occurred during his parenting time.

After analyzing each of the statutory best interest factors, the trial court cited two of the subsections regarding restrictions on parenting time found in Tennessee Code Annotated section 36-6-406(d) as weighing in favor of Mother. The order stated that

"Father will have to sacrifice some physical interaction with the children [so] that they can engage in appropriate developmental extracurricular activities and educational opportunities." Thus, for the parenting schedule, the trial court ruled that Father would have "two weekends per month during the school year," but weekend time was "to be structured around the children's activities." The order provided that Mother would "determine the meeting point and the times the parties shall meet." The order clarified that Father would "be given credit for Friday through Sunday," but Mother would "determine whether to meet with the children on Friday night or Saturday morning to begin Father's parenting time, depending on the children's activities." The order stated that Mother "is not to unduly engage the children in activities in an effort to thwart Father's parenting time."

The order stated that "Father will enjoy both Spring and Fall school breaks," "[u]ntil the children reach the age of 14, when they will be allowed to give their opinions as to how they spend their free time." The court found that Mother testified that "she did not oppose Father exercising as much summer parenting time as possible," although the children generally had summer activities that they enjoyed. The trial court adopted the following provision for summer parenting time:

> The Court finds that the summer parenting time should be scheduled around the children's activities. Father shall be allowed as much time as is available in the summer from 6:00 p.m. the first Sunday after end of school year until 6:00 p.m. the Sunday two weeks prior to the beginning of the school year, contingent upon Father making the children available for events and activities desired by the children over the summer. These events and activities can occur where Father resides or where Mother resides. If the children engage in activities in their home town of Jacksonville, and Father is unable to make the children available for any reason and forced to sacrifice physical time with them, he will not be penalized for not exercising all available summer parenting time. If the children desire to engage in activities during the summer where Father resides, Mother will make every effort to accommodate the children to spend summer with their Father. If the children do not engage in any structured activities during the summer, they should spend the entire summer with their Father.

Father and Mother would split Thanksgiving and Christmas time equally. The order also addressed the passport issue. Finally, the trial court noted that both attorneys had presented affidavits of their attorney fees to the court, "neither of which is challenged as excessive or unreasonable." The court found Mother's request for an award of attorney fees "justified and reasonable" and awarded her $17,487.70 for her fees. The order stated that child support would be addressed in a separate proceeding. Mother filed a motion to alter or amend, which the trial court denied.

At oral argument before this Court, members of the panel questioned the attorneys regarding whether the outstanding issue of child support had ever been resolved, as well as whether the outstanding issue of attorney fees in the 2018 order had ever been addressed. Counsel suggested that the issue of child support had been addressed by a separate order. However, the attorneys were uncertain as to whether the outstanding issue of attorney fees, in the 2018 order, was ever resolved. Thereafter, the record on appeal was supplemented with an order resolving the issue of child support, but nothing was submitted with respect to the attorney fee issue.

## II. ISSUES PRESENTED

Father presents the following issues for review on appeal:

1. Whether the trial court erred by modifying the previous order regarding Father signing for passports.
2. Whether the trial court erred by modifying the then existing parenting schedule.
3. Whether the trial court erred by ordering Father to pay Mother's attorney fees.

In addition, Mother presents an issue regarding whether she should be awarded attorney fees on appeal. For the following reasons, we vacate in part, affirm as modified, and remand for further proceedings.

## III. DISCUSSION

### A. Modification of the 2018 Order regarding Passports

The first issue raised on appeal by Father is whether the trial court erred by modifying its previous order regarding the passports. The scope of his argument, however, is quite limited. Father argues that the juvenile court's 2018 order addressed the passport issue, and it "was never appealed from, and therefore became a final order June 11, 2018." "Therefore," Father argues, "the passport issue is either *res judicata* and cannot be modified or if modification is appropriate or available there must be a showing of a material change in circumstances." In other words, Father argues that *res judicata* barred any change to the 2018 ruling on passports, or "[i]n the alternative," a material change in circumstance was required before it could be altered, which Mother failed to show.

Neither of these arguments has merit with respect to the 2018 order. That order specifically stated that "[t]he Court hereby reserves the issue of attorney fees." As a result, it was not final or appealable. "A final judgment is one that resolves all the issues in the case, 'leaving nothing else for the trial court to do.'" *In re Est. of Henderson*, 121 S.W.3d 643, 645 (Tenn. 2003) (quoting *State ex rel. McAllister v. Goode*, 968 S.W.2d 834, 840 (Tenn. Ct. App. 1997)). An "order that adjudicates fewer than all of the claims, rights, or liabilities of all the parties is not final, but is subject to revision any time before the entry

of a final judgment." *Id.* (citing Tenn. R. App. P. 3(a)). A judgment is not final "if it is entered while a motion for attorney's fees is still pending." *Khan v. Regions Bank*, 572 S.W.3d 189, 194 (Tenn. Ct. App. 2018). Thus, the 2018 order was not final, according to the record submitted to this Court on appeal.

Father's counsel conceded during oral argument, when questioned regarding the finality of the 2018 order, that its finality would "have a big bearing" on his res judicata argument because his res judicata argument would require a final order. He stated that he did not represent Father at the time and was uncertain as to whether the issue of attorney fees was ever resolved, but he admitted that "in order to be res judicata the prior judgment had to be final." We agree. "'[F]or res judicata . . . to apply, the judgment in the prior case must have been final.'" *Sims v. Adesa Corp.*, 294 S.W.3d 581, 586 (Tenn. Ct. App. 2008) (quoting *Frank Rudy Heirs Assocs. v. Sholodge, Inc.*, 967 S.W.2d 810, 813 (Tenn. Ct. App. 1997)). In *Sims*, for example, plaintiffs similarly argued that an order was "shielded from challenge under the doctrine of res judicata," but we explained that "the order under review in this case was not a final judgment, but rather an interlocutory order, and accordingly, it is not protected under the doctrine of res judicata." *Id.* Likewise, in this case, because the 2018 order did not resolve the issue of attorney fees, it did not have preclusive effect under the doctrine of res judicata. *See Khan*, 572 S.W.3d at 194 ("[T]he trial court entered its October 16, 2015 order before ruling on the Bank's motion for additional attorney's fees. . . . Because the trial court's October 16, 2015 order did not resolve the issue of post-arbitration attorney's fees, it was not a final judgment. Therefore, we hold as a matter of law that Ms. Khan's complaint in the instant action was not barred by the doctrine of res judicata.").

We also note that "the material change in circumstances requirement is based on the principles of res judicata." *In re Gabby G.*, No. M2024-00541-COA-R3-JV, 2025 WL 2335851, at *6 (Tenn. Ct. App. Aug. 13, 2025). "'Final custody orders' are *res judicata* and cannot be modified absent a material change of circumstance. . . . However, this standard for modifying a custody order does not apply when there is no final custody order in existence[.]" *In re Samuel P.*, No. W2016-01665-COA-R3-JV, 2018 WL 1046784, at *11 (Tenn. Ct. App. Feb. 23, 2018) (citations omitted). For instance, "we have held that it was not necessary to show a material change of circumstance where the initial custody order the parties sought to modify did not become final due to the filing of a motion to alter or amend." *Id.* (citing *DuBois v. DuBois*, No. M1999-00330-COA-R3-CV, 2001 WL 401602, at *6 (Tenn. Ct. App. Apr. 23, 2001); *Young v. Young*, No. 01A01-9801-CH-00047, 1998 WL 730188, at *3 (Tenn. Ct. App. Oct. 21, 1998)). Because the 2018 order addressing the passport issue was not final, no material change in circumstance needed to be shown in order to modify it. Thus, Father's arguments that the trial court erred by modifying the passport ruling are without merit.[3]

---

[3] Father's brief also states, "In the alternative, Father claims the Trial Court erred by refusing to admit the China Travel Advisory. This document falls under the hearsay exclusion, T.R.E. 803(8), Public

### B.    *Modification of the 2018 Parenting Schedule*

Next, Father argues that the trial court "erred by modifying the then existing parenting schedule" from 2018.   Again, however, we emphasize the limited nature of Father's arguments on appeal.   We also note that neither party raises any issues on appeal challenging the rulings in the 2018 order.

Appellate courts review a trial court's factual findings "de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise." *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013) (citing Tenn. R. App. P. 13(d); *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984)).   We review questions of law de novo with no presumption of correctness.   *Id.*   With respect to parenting matters, our supreme court has further explained:

> Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, *Holloway v. Bradley,* 190 Tenn. 565, 230 S.W.2d 1003, 1006 (1950); *Brumit v. Brumit,* 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997), trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Massey-Holt v. Holt,* 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). Thus, determining the details of parenting plans[4] is "peculiarly within the broad discretion of the trial judge." *Suttles v. Suttles,* 748 S.W.2d 427, 429 (Tenn. 1988) (quoting *Edwards v. Edwards,* 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge,* 42 S.W.3d 82, 88 (Tenn. 2001). A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Id.* "An abuse of discretion occurs when the trial court ... appl[ies] an incorrect legal standard, reaches an illogical result, resolves

Records and Reports. This document should have been admitted into evidence, considered by the Court and used to disallow Mother from getting passports for the children."  We deem this skeletal argument waived. *See Sneed v. Bd. of Pro. Resp. of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010) ("It is not  the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived."); *Newcomb v. Kohler Co*., 222 S.W.3d 368, 400 (Tenn. Ct. App. 2006) ("A skeletal argument that is really nothing more than an assertion will not properly preserve a claim[.]").

[4] We recognize that the juvenile court did not adopt a formal parenting plan but set forth its rulings in an order.  "Parenting plans are not required in juvenile court. However, '[t]he juvenile court may incorporate any part of the parenting plan process in any matter that the court deems appropriate.' Tenn. Code Ann. § 36-6-41[1]."  *In re Connor S.L.*, No. W2012-00587-COA-R3-JV, 2012 WL 5462839, at *2 n.4 (Tenn. Ct. App. Nov. 8, 2012).

the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski,* 350 S.W.3d 99, 105 (Tenn. 2011). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge,* 42 S.W.3d at 88.

*Id.* at 693.

To briefly recap, the 2018 custody order provided that Father had parenting time on the first, third, and fifth weekends of each month, from 6:00 p.m. Friday until 6:00 p.m. Sunday. It provided Father with one day of parenting time at Thanksgiving, and parenting time from Christmas Day evening until New Year's Day. Finally, for June and July, the parties divided summer time and alternated 15-day periods with the children, such that Father had roughly one month of parenting time during summer break. Under the 2018 order, Father was responsible for traveling to pick up the children to start his parenting time, and Mother was responsible for traveling at the conclusion of his parenting time. At trial, Mother took the position that she did not want to reduce Father's parenting time, but she did want to essentially redistribute it so that he had less weekend time but "a longer period" in the summer and during school breaks.

The trial court modified the 2018 parenting schedule to provide that Father would have only two unspecified weekends per month during the school year, but "to be structured around the children's activities."[5] The order provided that Mother would "determine the meeting point and the times the parties shall meet," and she would also determine "whether to meet with the children on Friday night or Saturday morning to begin Father's parenting time, depending on the children's activities." The order provided that Father would have parenting time for both Spring Break and Fall Break, but only until the children reach the age of fourteen, "when they will be allowed to give their opinions as to how they spend their free time." The order similarly provided that summer parenting time would be "scheduled around the children's activities." It provided that Father would be allowed "as much time as is available" from 6:00 p.m. the first Sunday after the end of the school year until 6:00 p.m. the Sunday two weeks before school started back, but

---

[5] The trial court first found that a material change in circumstances had occurred since the 2018 order, although, as explained above, this was not necessary given the fact that the 2018 order was not a final order. *See Freeman v. Freeman*, 579 S.W.3d 1, 5 (Tenn. Ct. App. 2018) (explaining that if a final judgment had *not* been entered, "then the court's prior orders were subject to revision by the court at any time"); *In re Samuel P.*, 2018 WL 1046784, at *11-12 ("Without a final order entitled to res judicata effect, it was not necessary for Mother to show a material change of circumstance. Ultimately, the trial court found that Mother had proven a material change of circumstance, and then the court found that modifying the mediated parenting plan was in Samuel's best interest. The first step of this analysis was unnecessary, but this error does not require reversal.").

"contingent upon Father making the children available for events and activities *desired by the children* over the summer." (emphasis added). The order provided that "[t]hese events and activities can occur where Father resides or where Mother resides." If the children engaged in activities in Jacksonville, and Father was unable to make the children available or was "forced to sacrifice physical time with them," he was not to be "penalized" for not exercising all available summer parenting time. The order stated that "[i]f the children desire" to engage in activities during the summer where Father resided, Mother would make every effort "to accommodate the children to spend summer with their Father." If the children did not engage in any structured activities, "they should spend the entire summer with their Father."

On appeal, Father argues that the trial court's order, "in effect," limits his parenting time by allowing Mother to determine when or even if parenting time is going to start. He first contends that the trial court's order permits Mother to thwart his summer parenting time by simply scheduling extracurricular activities in Alabama and requiring Father to either take them to those activities or return them to Mother. Thus, Father claims that even though the court ordered that the children would be with him for six of the eight weeks in the summer, the order permits Mother to limit Father's parenting time and effectively grants her authority to deny him visitation.

From our reading of the order, it actually grants the parties' young children the authority to determine their summer parenting schedule. It provides that "summer parenting time should be scheduled around the children's activities." It sets out the specific time period for Father's summer parenting time but then makes it "contingent upon Father making the children available for events and activities *desired by the children* over the summer." (emphasis added). It centers on whether "the children desire to engage in activities during the summer where Father resides," where Mother resides, or not at all.

This Court considered a similar issue in *Carter v. Carter*, No. M2013-00193-COA-R3-CV, 2013 WL 5568360 (Tenn. Ct. App. Oct. 7, 2013). In that case, a mother filed a petition to modify a parenting schedule, claiming that the present schedule "inappropriately interferes with the school, extracurricular and social activities in which the minor child of the parties engages and/or wishes to engage at the present time." *Id.* at *1. The trial court heard testimony from the parties and their teenage daughter, and the court made some changes to the schedule. *Id.* Still, the mother argued on appeal that "the trial court erred in denying the 16-year-old child the right to determine when and under what circumstances she would have parenting time with Father." *Id.* We found no merit in this argument. We noted that the "reasonable preference" of a child twelve years of age or older is "one of many factors to be considered by the court." *Id.* at *3. However, we stated, "This Court is aware of no authority for permitting a child to have the discretion to decide when and whether to spend time with a parent." *Id.* Simply put, "A minor child cannot determine when he or she will see a parent." *Id.*

- 14 -

We have recognized this principle in other cases as well. *See, e.g.*, *In re Charles B.*, No. M2024-00360-COA-R3-PT, 2024 WL 5233227, at *27 (Tenn. Ct. App. Dec. 27, 2024) *perm. app. denied* (Tenn. Mar. 17, 2025) ("A trial court cannot allow a child to unilaterally decide the outcome of the best interest analysis, particularly considering that a child's testimony could be inappropriately influenced by outside factors, such as favoritism toward one parent."); *In re McKayla H.*, No. W2020-01528-COA-R3-JV, 2023 WL 2809507, at *12 (Tenn. Ct. App. Apr. 6, 2023) ("The Child cannot be faulted for lacking a complete understanding of the intricacies that affect her well-being. So, while courts should *consider* an older child's preference when deciding whether relocation is in that child's best interest, because children may not always understand what is in their own best interest, as is the situation here, we agree with the trial court that this factor does not weigh for or against relocation."); *In re Aiden W.L.*, No. W2021-01187-COA-R3-JV, 2022 WL 17684082, at *9 (Tenn. Ct. App. Dec. 15, 2022) ("[T]he child's preference is not controlling on the trial court, and it is error for a trial court to base its decision solely on a child's preference."); *In re Alysia S.*, 460 S.W.3d 536, 577 (Tenn. Ct. App. 2014) ("In addition, this young child cannot be the one to decide whether she will visit or be reunited with Mother."); *Helson v. Cyrus*, 989 S.W.2d 704, 707 (Tenn. Ct. App. 1998) ("We come back to the conclusion that the visitation in this case is based entirely on the child's wishes, and we conclude that allowing a nine-year-old boy to decide whether his father can exercise his court-ordered visitation is not an exercise of the chancellor's discretion. Rather, it leaves the question to the discretion of the child. As we have recently held, the child's preference is only one factor to be considered in deciding which parent gets custody of the child. It simply can't be the only factor to consider in deciding visitation privileges.") (citation and quotation omitted); *Wilson v. Wilson*, 987 S.W.2d 555, 564 (Tenn. Ct. App. 1998) ("The second reason Dr. Oakley advances for opposing Mr. Wilson's visitation rights is simply that the child is against it. . . . But allowing minor children to dictate a parent['s] visitation rights is a strange concept. As Mr. Wilson points out, if the issue was custody and not just visitation, the child's state of mind would be only one factor the courts should consider. It simply cannot be the only factor to consider in deciding visitation privileges.") (citation omitted). Given these decisions, we hereby modify the trial court's order to vacate all provisions making Father's summer parenting time "contingent upon Father making the children available for events and activities desired by the children over the summer." As originally provided in the order, Father's summer parenting time will be "from 6:00 p.m. the first Sunday after end of school year until 6:00 p.m. the Sunday two weeks prior to the beginning of the school year."[6]

---

[6] Even though Mother remains sole decisionmaker for decisions regarding the children's extracurricular activities, she cannot schedule those activities during Father's summer parenting time absent his consent. Mother appears to recognize this. Her brief on appeal summarizes her trial testimony on these issues as follows: "Mother states she would like to limit the every other weekend visitation and give additional time in the summer and for Spring Break. . . . Mother denies that if she is given final decision making authority that she will force these [extracurricular] activities during Father's parenting time." Her actual trial testimony was as follows:

Next, Father challenges the trial court's rulings regarding his weekend parenting time and transportation arrangements. He contends that "Mother has the ability to modify, or even cancel, Father's parenting, if the child has an event (of any kind) at the sole discretion of Mother." As Father notes, the order removed the designation of which weekends were assigned to Father (previously the first, third, and fifth), so that he now has "two (2) weekends per month," with weekend time "to be structured around the children's activities." Father argues that this plan "lacks structure or definition." Father rightly notes that the order also allows Mother to decide whether his weekend visits will begin on Friday evening or Saturday morning and when and where to meet for the exchanges. Thus, according to Father, "Mother now has the ability to force Father to pick up the children in Jacksonville, Alabama on a Saturday morning and return the children to Jacksonville, Alabama on Sunday evening." Father concedes that trial courts are vested with wide discretion when determining the details of parenting schedules, but he notes that such decisions are not immune from appellate review and will be reversed for an abuse of discretion.

To begin, we note that Mother's response to Father's petition to modify initially proposed reducing the weekend travel "if the Court finds it is getting more challenging and riskier for Father to commute 300 miles for the current parenting time because of the potential health issues or reduced energy levels due to aging (Father is over seventy years old)[.]" At trial, however, the parties agreed that the travel required by the 2018 order had become extremely burdensome for everyone. For each weekend visit, it required Father to make the ten-hour drive (roundtrip) on Fridays and Mother to make the ten-hour drive on Sundays. Both acknowledged that this was difficult for the driving parent and the children. Father was sometimes spending the night in Mississippi to "help with the drive time." Mother testified that she once had to stop six times for Alivia to use the bathroom due to her urinary tract infections and prediabetes. Both parents indicated that they were in favor of meeting halfway for exchanges rather than each having sole responsibility for one travel day. As Father put it, "It would just be easier on everybody." The trial court did not adopt this plan, however. The trial court's order has the potential to put *all* of the travel burden on Father *and* condense the travel into an even shorter period. If Mother elects to begin Father's parenting time on a Saturday morning due to the children having activities, the children will have to travel on consecutive days. If she begins his parenting time on a Saturday morning, and it ends at 6 p.m. on Sunday evening, each "weekend" visit is essentially shortened to a period of roughly 36 hours. And, Mother can require Father to transport the children twenty of those hours. Father's fear about Mother's scheduling is not unfounded, as Mother testified at trial that scheduling the children's telephone calls

---

Q.    So if you have final decision making and any of these activities occur in the summer, are you wanting your final decision making to force these activities to happen on [Father's] parenting time? Is that your position?
A.    No, ma'am.

with Father had already become "very difficult since the kids have activities almost every day now." We also note that when Mother suggested replacing some of Father's weekend time with equivalent time in the summer, she recognized that he was already having little quality time with the children on his weekends and essentially seeing them "for a day" due to them spending so much time in the vehicle. We conclude that shortening that time even further, by an additional day, is simply illogical given the distance between the parties, and it is not in the children's best interest. We further conclude that the trial court's ruling on transportation is outside the range of acceptable alternatives. It allows Mother to require Father to make the entire roundtrip drive of ten hours on both days for a weekend visit. The trial court's adoption of these provisions constitutes an abuse of discretion. We therefore vacate the transportation provision and the provision of the order allowing Mother to decide whether Father's weekend parenting time can alternatively begin on a Saturday morning.[7]

Father testified that he and Mother had agreed to meet halfway a few times, in Tuscumbia, Alabama, and he believed that it would be "easier on everybody" to change the transportation arrangement to require meeting there every time. His proposed parenting plan designated that location as the meeting point for exchanges. When Mother was asked if she would rather meet halfway for exchanges, she replied, "I would like to," although she noted the parties had some conflicts in the past. Given the parties' apparent agreement that it would benefit everyone to meet halfway for exchanges, rather than remanding for additional proceedings and prolonging this already long-running litigation, we modify the order to adopt the provision in Father's proposed parenting plan requiring the parties to meet "at Love's at Tuscumbia on HWY 72 where they were exchanging the children by consent previously."[8] Father testified that the parties had previously agreed to change the Friday exchange time from 6:00 p.m. to immediately after school, so that he picked the children up in Alabama between 3:45 and 4:00 due to them taking the bus home. Assuming that Mother will now be driving half of the five-hour drive to meet Father with the children, we designate 6:30 p.m. as the Friday exchange time. We also modify the parenting schedule to specify that Father's weekend visits will occur on the first and third weekends of each month. However, the parties are free to modify the meeting time or location or swap weekends by agreement, as they did with the original pickup time. We encourage the parties to cooperate on these details.

---

[7] Given our conclusion that these provisions were not warranted by the circumstances of this case, it is not necessary to consider whether it was appropriate to give Mother sole discretion in the first place to decide on which day Father's parenting time would begin.

[8] We recognize that "[a] trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion," and "the specific modifications a trial court adopts to address a material change in circumstances and to serve the best interests of children are the kinds of details an appellate court should not 'tweak' absent an abuse of discretion." *Armbrister*, 414 S.W.3d at 693, 706. Here, however, an abuse of discretion is evident from the record regarding these details.

Finally, Father argues that the trial court's order should be vacated because "Mother's pleadings did not request a modification of the parenting schedule[.]" However, Father cites no authority in support of this argument, so we deem it waived. *See Sneed*, 301 S.W.3d at 615. All other arguments are deemed pretermitted.

### C.   *Award of Attorney Fees to Mother*

Father's final issue is whether the trial court erred by ordering him to pay Mother's attorney fees. Father acknowledges that the trial court's order stated that both attorneys had submitted affidavits of their attorney fees and that neither was challenged as unreasonable or excessive. Still, Father argues that the trial court did not make any findings, as provided in *Wright v. Wright*, 337 S.W.3d 166 (Tenn. 2011), and Tenn. Sup. Ct. R. 8, RPC 1.5(a), regarding the "factors to be considered in determining the reasonableness of a fee." Father cites *Wright* for the notion that "[t]o enable appellate review, trial courts should clearly and thoroughly explain the particular circumstances and factors supporting their determination of a reasonable fee in a given case." He claims that the trial court "simply accepted" the affidavit filed by Mother's counsel and "the Trial Court never provided Father with a chance to challenge the proposed fees." Father asks this Court to vacate the attorney fee award and remand for further proceedings consistent with *Wright*.

The record does not support Father's argument. At trial, Father's then-counsel, Ms. Grove, stated:

MS. GROVE: For the last exhibit I have, it's my affidavit of attorney fees. Does Ms. Hall [Mother's counsel] want us to just submit those at the end? Because *I think we both stipulated both of us have reasonable attorney fees*, but I can either introduce it now or I can introduce it later. Doesn't matter to me.

THE COURT: Ms. Hall, you got a preference?

MS. HALL: I would just say go ahead so I can put it on my list, introduce it now.

MS. GROVE: Okay.

MS. HALL: I'm going to do the same thing in mine.

THE COURT: Okay. Well, we'll call this Exhibit 4.

MS. GROVE: Is anybody going to cross-examine me on it?

MS. HALL: No.

MS. GROVE: Okay. *I'm not going to do that with you either, Laurie.* It' s just some people do.

(emphasis added). Toward the end of trial, Father's counsel again stated:

MS. GROVE: Before we go forward, though, there's nothing bad. I had, I think, Exhibit 3 or 4 put in, an affidavit of attorney fees. And Ms. Hall and I spoke, and it doesn't make sense to just periodically put in affidavits of attorney fees. And *we had already agreed that we had no objection to each other's affidavit* because we both have seen each other's work and billing statements so many times before. So we both would just like to put in a final one after the proof, and if that's acceptable to Your Honor to avoid us constantly having to put supplemental ones in.

THE COURT: That's fine with me. And I show Exhibit 4 as your affidavit.

(emphasis added). Thus, Father had an opportunity to challenge the reasonableness of Mother's fees and elected not to do so. The record does not support his claim that "the Trial Court never provided Father with a chance to challenge the proposed fees." "[A] trial court is not required to hold a hearing as to the reasonableness of the amount of attorney's fees awarded unless a party makes a timely request." *Cox v. Cox*, No. M2024-00827-COA-R3-CV, 2025 WL 1517810, at *15 (Tenn. Ct. App. May 28, 2025) (quoting *In re Samuel P.*, 2018 WL 1046784, at *20).

In addition, "a party waives the issue of the reasonableness of an opposing party's attorney fee by failing to raise the issue before the trial court." *Blount v. Blount*, 720 S.W.3d 295, 354 (Tenn. Ct. App. 2024). As such, we reject Father's assertion that it is necessary to remand to the trial court to apply the factors for determining the reasonableness of Mother's attorney fee. *See id.*; *see also Amonett's Eagle Auction & Realty, LLC v. Norris Bros. Props., LLC*, No. E2024-01931-COA-R3-CV, 2025 WL 3675831, at *6-7 (Tenn. Ct. App. Dec. 17, 2025) (rejecting the argument that it was necessary to remand to the trial court for findings of fact as to the reasonableness of an attorney fee where the party waived the issue of the reasonableness of the fees).

### D. *Attorney Fees on Appeal*

Mother seeks an award of her attorney fees on appeal, although she does not cite any authority in support of her request. Given Father's partial success, we respectfully decline her request.

### IV. CONCLUSION

- 19 -

For the aforementioned reasons, the decision of the trial court is hereby vacated in part, affirmed as modified, and remanded for further proceedings.  Costs of this appeal are taxed equally to the appellant, Hermes Rosa, and to the appellee, Jianping Huang, for which execution may issue if necessary.


s/ Carma Dennis McGee
CARMA DENNIS MCGEE, JUDGE